Cox & Hill, plaintiffs in error, *vs*. James F. Cummings, defendant in error.

1. The questions, what is just compensation under the Confederate Constitution; how and when it is to be ascertained; and how, when and in what paid; considered.
2. The Impressment Acts, and the mode prescribed therein, for making just compensation for private property taken for public use, discussed.
3. The schedule of prices fixed by the Board of Commissioners forty days previously, for articles of a certain quality, is not a proper criterion of the value of articles of another and better quality subsequently seized by the agents of the Government.

Possessory warrant and *certiorari*. Decided by Judge Bull, at Chambers, on the 25th of June, 1863.

This was a case of impressment of private property for public use, and was heard and decided upon the following facts, agreed to by the parties, to-wit:

William B. Jones & Co., of the city of Richmond, Virginia, purchased from A. C. Wyley & Co., of Atlanta, Georgia, thirty-three thousand nine hundred and forty-two pounds of brown sugar, contained in one hundred and thirty-five barrels. The sugar was stored in the warehouse of Messrs. Cox & Hill, in the city of Atlanta, Georgia, to be shipped to Richmond. It was not purchased by Jones & Co. for their own consumption, but was held for sale. The sugar was a choice lot, worth, according to the market price in Atlanta, $1 10 per pound, and the barrels which contained it, were worth $3 75 each. Major James F. Cummings, a Commissary of Subsistence, duly commissioned by the President of the Confederate States, gave notice to the agent of Jones & Co., on the 23d of May, 1863, that he would impress the sugar for the use of the Government of the Confederate States, and that the said agent must hold it for that purpose, the said Cummings at the same time tendering to the agent the sum of seventy-five cents per pound for the sugar, that being the price fixed by the Commissioners, appointed by the Confederate States and the State of Georgia, to be paid by the Government for sugar. The agent of Jones & Co. de-

clined to accept the sum tendered, on the ground that it was not just compensation for the sugar, at the same time proposing to let Cummings have the sugar at the market price, or at its value in the city of Atlanta at the time. Cummings declined the proposition, but admitted that in his judgment the sugar was worth eighty-five cents per pound, in comparison with the price fixed by the Commissioners, and declined to pay more than seventy-five cents per pound, because his counsel did not believe that he had the right, as an officer of the Government, to go beyond the schedule of prices arranged by the Commissioners. The agent of Jones & Co. then refused to hold the sugar for Cummings under the notice aforesaid. On the 16th of June, 1863, Cummings, as Commissary of Subsistence, seized the sugar (which at that time was worth $1 25 per pound) by an armed force, and carried it away without the consent of Jones & Co., or any agent of theirs, and against their wishes and protests.

Cox & Hill then sued out a possessory warrant, under which Cummings was arrested, and the sugar was seized, and the question of possession was submitted to and tried before William M. Butt and Bluford D. Smith, Esquires, Justices of the Peace of the Atlanta district. On the trial before the Justices, Cummings pleaded in justification of his seizure of the sugar, and as a reason why he should retain it, the Act of the Congress of the Confederate States, authorizing impressments, approved April, 1863, and also a General Order, of which the following is a copy, to-wit:

"GENERAL ORDERS, No. 37.

ADJUTANT AND INSPECTOR GENERAL'S OFFICE,
RICHMOND, April 6th, 1863.

The following Act of Congress concerning impressments, and the instructions of the War Department respecting it, are published for the information and direction of all concerned:"

(The Act of Congress, being a public law, is omitted.)
This is the order:

"By the authority of the Act of Congress aforesaid, the

Cox & Hill *vs.* Cummings.

Secretary of War hereby recognizes impressment as a legal and operative mode of securing necessary supplies of subsistence, medical and quartermaster's stores for the armies of the Confederate States, in the field, and to accumulate them in magazines, posts and depots, owing to the impracticability of procuring them by contract.

2d. " Impressments may be made under orders from generals commanding armies, departments, corps, divisions, brigades, and by commanders of detached parties and posts, when a necessity arises, which orders may be executed by quartermasters, commissaries, or medical purveyors, and their subordinates, for their respective departments.   The Quartermaster General, Commissary General and Surgeon General may designate the officers and persons who shall be competent to make impressments to accumulate supplies at posts and depots.

3d. " No officer or agent shall impress the necessary supplies which any person may have for the consumption of himself, his family, employees, slaves, or to carry on his ordinary mechanical, manufacturing or agricultural employments.

4th. " Before any impressment of property shall take place the impressing officer or his agent shall make an offer, addressed to the owner, his bailee or other agent, to purchase the property, describing the property he wishes to purchase, the price to be paid, and the mode of payment, whether in money or by certificate, and stating, that upon the refusal of the price offered that compensation for the property will be made according to the Act of Congress aforesaid, for the regulation of impressments ; which notice shall bind the said property until the completion of the negotiation for the sale or appropriation thereof, so that there can be no removal or transfer of the same.

5th. " In the event of the refusal of the price offered, the impressing officer shall proceed to settle the compensation to be paid according to the first section of the Act aforesaid, if the property belongs to a person who has grown, raised, or produced the same, or who holds or has purchased the same for his own use or consumption ; but the said property shall

be paid for according to the fifth section of the Act aforesaid, if the property is held for sale or other purposes than those before mentioned.

6th. "That the property shall remain in the possession of the owner, his bailee or agent, and at his risk during the pendency of the proceedings for the ascertainment of the compensation unless it shall be otherwise agreed to, or unless some urgent necessity shall require the possession of the property to be changed. In case of a change of possession, the Confederate States shall be regarded as the owner, and the property shall be held for their account and risk.

7th. "The impressing officer shall at the date of the impressment pay the owner, his agent, or attorney in fact, the compensation agreed upon *if it be practicable*; but if he cannot do so, he shall give a certificate, according to the second section of the Act aforesaid, which shall be paid upon presentation to the disbursing officer, who shall be designated for that purpose.

8th. " Impressments which shall be made before the appointment of the commissioners designated in the fifth section of the Act aforesaid, shall notwithstanding be legal; and in the cases provided for by that section a portion of the property shall be retained as samples, so that the price may be settled, and compensation adjusted according to the provisions of the same." By order,

"S. COOPER, " Adj't and Ins. Gen."

The following letter or order was also produced and used in the argument of the case, to-wit:

"CONFEDERATE STATES OF AMERICA,
"Subsistence Bureau, Richmond, April 14th, 1863.
" Major J. F. CUMMINGS, C. S., Atlanta, Ga.:

*Sir*:—In compliance with paragraph 2d of Article II, of General Orders No. 37, a copy of which is herewith enclosed, the Commissary General hereby designates you as an officer of this Bureau to impress. You will not extend this power to any one. Very respectfully your ob't serv't,

"R. WILLIAMS, Major C. S."

Cox & Hill *vs.* Cummings.

Upon the hearing of the case, the justices of the peace ordered the sugar to be delivered to Cox & Hill, and that Cummings pay the cost.

Cummings excepted to the judgment of the justices and obtained a writ of *certiorari* for the purpose of having the same reviewed by the Superior Court of Fulton county.

The parties agreed that Judge Bull might hear and determine the *certiorari* in vacation at Chambers, and that besides the question of possession he should also decide what was just compensation for the sugar, and that his judgment on both subjects should be reviewed by the Supreme Court.

Judge Bull reversed the judgment of the justices and set the same aside, and recommended that Cummings should pay ten cents per pound for the sugar, in addition to the seventy-five cents per pound already paid.

Cox & Hill being dissatisfied with Judge Bull's decision prosecute this writ of error to reverse it.

A. W. HAMMOND & SON, UNDERWOOD & SMITH, GARTRELL & HILL, for plaintiffs in error.

JOHN ERSKINE, Esq., and HAMMOND & HOYT, for defendant in error.

*By the Court.*—LUMPKIN, C. J., delivering the opinion.

In the discussion of this case, several obligations were stated, rather than seriously urged, to the regularity of the impressment proceeding by the able counsel for the plaintiffs in error. It is suggested that the Secretary of War has not expressed any opinion that it was necessary to take private property for public use, in Atlanta, or the region round about, as it was incumbent on him to do, by the fourth section of the Impressment Act; neither has any order to impress been issued. The section alluded to declares "That whenever the Secretary of War shall be of opinion that it is necessary to take private property for public use, by reason of the impracticability of procuring the same by purchase, so as to accumulate necessary supplies for the army, or the good

Cox & Hill *vs.* Cummings.

of the service—*in any locality*—he may, by *general order*, through the proper subordinate authorities, cause such property to be taken, the compensation due the owner for the same to be determined and the value fixed, as provided for in the first and second sections of this Act."

The suggestion is that the Secretary of War has only said that he recognized impressments as a legal mode of procuring and accumulating supplies, owing to the impossibility of obtaining the same by purchase, and he simply appoints a person to impress. It is asked, can that opinion apply to a locality where the owner proposed to sell the property at the value thereof in market overt? We let this point pass, remarking that the agents of the Government act only by virtue of the authority delegated to them by law. Its provisions should be presumed. For the Secretary of War to recognize impressment as a legal mode of procuring supplies which could not be obtained by purchase, would be superogatory—Congress having passed the law for that express purpose. By the fourth section, it was contemplated that the Secretary of War should say by his order in what locality it was necessary for this power to be exercised.

Colonel Underwood has occupied some time in undertaking to define the boundary line between State sovereignty and the powers of the Government of the Confederate States—a subject exceedingly interesting, for its importance, at least, if not its novelty. He contends that the right of eminent domain is inherent in the States, and has not been parted with to the Confederate States. Concede it: what then? To the Confederate States the power to take private property for public use has been conferred by necessary implication. See section IX., paragraph 16. Indeed, the words of the Constitution would seem to presuppose an exterior, if not anterior, right; and seeks only to limit its exercise: "Nor shall private property be taken for public use without just compensation." This is nothing more nor less than the law of self-preservation, applied to nations. And if there ever was an occasion when it could be justified, it is now, in the death-struggle in which our people are engaged to save themselves and their

Cox & Hill *vs.* Cummings.

posterity from subjugation by the abolition vandals of the North. Indeed, the learned counsel admits that the power to take private property for public use exists in the Confederate Constitution, and that Congress possesses this power, with the limitation prescribed—that is, by making just compensation; and says that this is only in affirmance of the great principles of the common law.

The important questions then in this case are, what is meant by just compensation ? How and when is it to be ascertained ? and how, when and in what paid ?

It is insisted that the mode prescribed by the impressment acts for making just compensation is unconstitutional, inasmuch as it allows the owner of property no voice in the matter.

Congress passed an impressment bill, the design of which was to protect the holder ; and it provided that compensation should be determined in the case of producers by two or three impartial loyal citizens of the vicinage, and in the case of non-producers, by two commissioners in each State, one appointed by the President, the other by the Governor. Soon after the passage of the Act a case of impressment occurred in Virginia, of hay, and the appraisers it was alleged put on a most exorbitant price, acting on the erroneous impression that true and loyal citizens would invariably extort from the Government extravagant prices. Congress passed a supplemental bill, providing that in case the impressing officer did not approve the award of the appraisers he should so endorse on the appraisement and leave the matter of price over to be settled by the State Commissioners without allowing a correlative right to the producer, and under this supplemental bill instructions were issued from the War Department at Richmond, prohibiting impressing agents from approving any appraisement in excess of the schedule prices fixed by the Commissioners for the whole State, and thus, in fact, the principle of adjusting compensations by the arbitrament of loyal and impartial citizens of the vicinage, a most important feature of the original impressment bill, has been superceded and wholly abandoned.

We shall be pardoned, we hope, for intimating that this order, like that of Adjutant and Inspector General Cooper's, under the first Conscript Act of April, 1862, declaring that persons incapable, by reason of bodily infirmity, for *field duty*, were nevertheless subject to be enrolled, was not warranted by the law, and that this order at least, like that was, should be promptly ignored by Congress.

Let it be borne in mind that the case before us, is not claimed to be one of immediate and pressing necessity and which admits of no delay. For such emergencies the principles here considered do not apply. It is to accummulate supplies in certain localities, looking to the future wants of the army. In all such cases it has been held, upon high authority, that private property can only be taken constitutionally in one of three ways, to-wit:

1. By the agreement of the parties, that is, by stipulation between the agents of the Government and the owner.

2. By commissioners mutually selected by the parties; and

3. By the intervention of a jury. In our humble opinion, policy, if not the Constitution, requires that our legislation upon this subject should conform to the spirit of this fundamental principle. It is the surest, if not the only way of securing in every case, that just compensation guaranteed by the Constitution. Congress is but the creature of the Constitution. It is obvious, therefore, that Congress can pass no law depriving the owner of his property, even for public use, unless adequate compensation is secured by the law.

In the case of Vanhorne's Lessee vs Dorrance, 2 Dallas, 304, which is a leading authority upon this subject, Mr. Justice Patterson, in delivering the opinion of the Court, takes occasion to refer to the *Isle of Man*, the jurisdiction of which subordinate royalty was vested in private persons, which being found inconvenient for the purposes of public justice and for the revenue, on account of the commodious asylum which it afforded to debtors, outlaws and smugglers, was purchased, not seized, by the Crown. He then proceeds to comment thus upon the transaction:

" The case of the *Isle of Man* was a fair and honorable

Cox & Hill *vs.* Cummings.

stipulation. It partook of the spirit and essence of a contract. It was free and mutual. It was treating with the proprietors on equal terms. But if the business cannot be effected in this way, then the value of the land intended to be taken should be ascertained by commissioners, or persons mutually elected by the parties, or by the intervention of the judiciary, of which a jury is a component part. In the first case we approximate nearly to a contract, because the will of the party whose property is to be affected, is in some degree exercised—he has a choice, his own act co-operates with that of the Legislature. In the other case there is the intervention of a court of law, or in other words, a jury is to pass between the public and the individual, who after hearing the allegations and proofs of the parties, will, by their verdict, fix the value of the property or the sum to be paid. The interposition of a jury is in such case a constitutional guard upon property, and a necessary check to legislative authority. It is a barrier between the Legislature and the individual which ought not to be removed. As long as it is preserved, the rights of private property will be in no danger of being violated, except in cases of absolute necessity or great public utility."

Again : " It is contended that the Legislature must judge of the necessity of interposing their despotic authority; it is a right of necessity, upon which no other power in Government can decide ; that no civil institutions are perfect, and cases will occur in which private property must yield to urgent calls of public utility or general danger. Be it so. But then it must be upon complete indemnification to the owner. But who shall judge of this indemnity ? Is it necessary that the value of the property must be judged by the board of property without the consent of the party or the interference of a jury ? Alas, how necessity begets necessity. They rise upon each other and become endless. The proprietor stands afar off, a solitary and unprotected member of the community, and is stripped of his property without his consent, without a hearing, without notice, the value of the property judged, (*pre-judged,*) without his participation or

the intervention of a jury. If this be the legislation of a republican government in which the preservation of property is made sacred by the Constitution, I ask wherein it differs from the mandate of an *Asiatic* prince. Omnipotence in legislation is despotism. According to this doctrine we are all mere tenants-at-will, holding our property at the mere pleasure of the Legislature. Precarious tenure! And yet we boast of property and its security, of laws, of Courts, of constitutions, and call ourselves free!

I should state that it is said in a note appended by the Reporter to the end of this case that a writ of error was brought on the judgment of the Circuit Court, which was said to be then pending in the Supreme Court; what became of it I know not, as I can find no further notice of it in the reported decisions of the Supreme Court. Be that as it may, we cannot believe for a moment that the great constitutional doctrines enunciated by the Judge have ever been impaired by the adjudications of that or any other Court.

In the light of the above vital truths, we would ask, was just compensation allowed in this case? We would premise that the mode of arranging a schedule of prices, by the commissioners, for the whole State, every sixty days, may give just compensation; but if so, it is accidental. The prices will generally be too much or too little for some articles in the various districts of a large State. It has no reference to demand and supply at the time and place the article is seized, than which nothing is more fluctuating at this eventful period. The commissioners meet to-day and fix the price of good sugar in Atlanta at seventy-five cents per pound, and this is the standard of valuation for the next two months. Long prior to the expiration of that time, owing to the quantity in market and the prospects of future supply, prices have undergone a great change—either advancing or declining. How often has this fact been witnessed during the progress of the war? On the fifty-ninth day from the time when the commissioners last met, sugar is seized at the then schedule price. The day following the commissioners convene and agree on another schedule; sugar is seized under the new schedule, and the

very same property in quality, perhaps owned by the same individual, is valued quite differently from that taken the day before; and yet this must be taken as just compensation in both cases. This is self-evidently absurd. It cannot be so. There can be no diversity of opinion upon this subject.

It is the duty of the Government to provide some fair and proper mode to ascertain the value of property taken, and to pay for it without delay. The citizen may be compelled to submit to this encroachment upon his private rights, when the public good requires it. But whenever he is forced to make the surrender, he is entitled to the value of the property taken, and *at the time it is taken*—the amount to be assessed by a proper tribunal and paid in money. It is a debt against the public, who takes the property, and must be paid like all other debts. The rule we hold to be this: the fair cash value of the property taken for public use, if the owner were willing to sell and the Government desired to buy, at that time and place and in that form, would be the measure of just compensation. And let not Congress legislate upon the idea that the people are too corrupt to be trusted. For if so, they are unworthy of the boon for which we are fighting, and our martyred heroes have sacrificed their lives in vain.

But to come more particularly to the facts of the case at bar. No schedule of price was ever fixed by the commissioners for the lot of sugar impressed by Major Cumming. It is admitted on the record that the commissioners fixed seventy-five cents per pound as the price of good sugar, and that is the only class of sugar to which any price was fixed. The sugar in controversy was not of that class, but was *choice* sugar, and of a higher grade, and consequently this sugar did not come within the schedule of prices fixed by the commissioners. The law requires that a schedule of prices shall be fixed by the board of commissioners, so as to afford just compensation to the owner. We repeat, no price was fixed for *choice sugar*, and therefore it was the right of the owner to insist on some fair mode of obtaining his constitutional compensation.

Good sugar is a class of sugar well understood by mer-

chants, and is a grade below choice sugar.   The commission-
ers were not governed by the value of the sugar at the time
it was taken, for they had fixed the price of good sugar forty
days previously.   The proof is, that this sugar was worth
$1 10 at the time it was taken.   The Circuit Court says,
there is no proof that the commissioners did not take the
market price as the standard of value for this grade of sugar.
But we think the Judge is mistaken.   There is no dispute as
to the quality of the sugar.   The proof, and the only proof,
is, that it was choice sugar of the value of $1 10 per pound,
whereas the price fixed by the commissioners, and tendered
by the Government agent, was seventy-five cents per pound.
The commissioners could not then have taken the market
price as the standard of value, especially when the Commis-
sary, himself, has admitted on the record that this particular
sugar, in comparison with good sugar at seventy-five cents,
was worth eighty-five cents per pound.

We are of the opinion, then, that admitting the law to be
constitutional, it appears from the record that no schedule of
prices, including this particular grade of sugar, ever was fixed
by the board of commissioners, either at the time it was
taken or before; that its true value never has been ascertained
by any legal or constitutional tribunal; and that the same
was seized by the agent of the Government against the con-
sent of the holders, without making or tendering therefor.
just compensation.   And as the parties have agreed that the
Circuit Judge, or this Court in the last resort, shall prescribe
some fair mode of adjusting the difficulty, we advise that the
question of just compensation be referred to a special jury at
the next term of the Superior Court of Fulton county, unless
the parties shall before that time agree upon the price to be
paid for the sugar.

Let the judgment be reversed with instructions.